## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

_____

CHS, INC., a Minnesota cooperative,

      Plaintiff,

v.

GOLDEN GRAIN FARMS, LLC, a Michigan limited liability company,

      Defendant.

Case No. 1:19-cv-663

Honorable

**COMPLAINT**

---

Brion B. Doyle (P67870)
VARNUM LLP
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

---

Plaintiff, CHS, Inc., by and through its attorneys, Varnum, LLP, states for its Complaint against Defendant, Golden Grain Farms, LLC, as follows:

## INTRODUCTION

1.    This Complaint arises from Defendant, Golden Grain Farms, LLC's ("Golden Grain Farms") sale of unmerchantable and compromised soybeans to Plaintiff CHS, Inc. ("CHS").  During the 2016 growing season, Golden Grain Farms spread dredge spoils from the Kalamazoo River Superfund site onto land that it was renting, and it then planted and grew soybeans in that sediment.  Without disclosing any of this to CHS, Golden Grain Farms sold some of the soybeans to CHS, and CHS placed the soybeans into storage at a bin at its facility in Hamilton, Michigan.

2.    When the Michigan Department of Agriculture and Rural Development ("MDARD") learned that Golden Grain Farms had sold soybeans that were grown on sediment

from a Superfund site, it locked the storage bin at CHS's facility and it issued a seizure order prohibiting the sale or disposal of any of the soybeans in the subject storage bin. Despite CHS and Golden Grain Farms' efforts over the course of the past three years, MDARD will not allow any of the soybeans in Bin #10 to be used for commercial purposes and will only authorize the soybeans in the bin to be incinerated or delivered to a landfill. As a result, the subject bin has remained locked since the issuance of the seizure order.

3.      In the almost three years that have passed since MDARD issued the seizure order, CHS has worked with Golden Grain Farms and directly with MDARD in an attempt to have the seizure order lifted. Golden Grain Farms has also provided numerous submissions to MDARD in support of its contention that the soybeans are safe for human and/or animal consumption. Despite these efforts, MDARD recently indicated that it would not allow the soybeans to be used for any commercial purpose and that it would only permit the soybeans to be removed from Bin #10 for purposes of destroying or disposing of them. CHS has requested on multiple occasions that Golden Grain Farms compensate CHS for its damages, which includes the value of the soybeans in Bin #10, the loss of the use of that bin for the past two years, as well as other incidental and consequential damages. Golden Grain Farms has refused to do so.

## PARTIES

4.      CHS is incorporated as a Minnesota cooperative with its principal place of business located at 5500 Cenex Drive, MS 110, Inver Grove Heights, MN 55077.

5.      Golden Grain Farms is a Michigan limited liability company, with offices located at 3957 108th St. SE, Caledonia, MI 49423. Tom Brink, a Michigan resident, is a member of Golden Grain Farms.

## JURISDICTION AND VENUE

6.     The amount in controversy exceeds $75,000, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, and Defendant is subject to personal jurisdiction in this district.

## GENERAL ALLEGATIONS

8.     CHS is a global agribusiness owned by farmers, ranchers, and cooperatives across the United States.  Among its other business enterprises, CHS supplies energy, crop nutrients, grain marketing services, animal feed, and food and food ingredients.

9.     Golden Grain Farms is engaged in the business of farming, principally growing corn and soybean crops in various counties in western Michigan.

10.     During the 2016 crop year, Golden Grain Farms grew soybeans on land that it rented in Douglas, Michigan.  The soybeans in question were grown in dredge spoils, or sediment, that had previously been collected from the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site ("Kalamazoo River Superfund Site") and placed in an impoundment under permit granted by the Michigan Department of Environmental Quality ("MDEQ").  Golden Grain Farms spread the dredge spoils, or caused them to be spread, within the impoundment area (the "Site").  The dredge spoils were then leveled and created the top layer in which Golden Grain Farms planted and grew soybeans.

11.     The dredged spoils and the property on which the soybeans were grown were subject to a restrictive covenant that was imposed by the MDEQ.  This covenant did not allow the Site to be used for agricultural purposes.  Upon information and belief, neither the property

owner nor Golden Grain Farms sought or obtained permission from the MDEQ to use the Site to grow crops.

12.     The Kalamazoo River Superfund Site is located in southwest Michigan and includes the lower three miles of Portage Creek, 75 miles of the Kalamazoo River between Morrow Lake and Lake Michigan, and four former disposal areas and associated mill properties. The site was declared a federal Superfund site because of the presence of PCBs in the fish, sediment, and surface water of the river.

13.     The Kalamazoo River Superfund Site was listed on the Environmental Protection Agency's ("EPA") National Priorities List in 1990.  In July 2017, the EPA Superfund Task Force identified the Kalamazoo River as one of 21 sites nationwide for "immediate, intense attention."

14.     On October 12, 2016, representatives of Golden Grain Farms delivered approximately 145 bushels of the soybeans – which had been grown dredge spoils from the Kalamazoo River Superfund Site – to a CHS facility in Hamilton, Michigan.  CHS weighed, purchased, and paid Golden Grain Farms for the soybeans, and CHS then placed the soybeans into one of its storage bins known as Bin #10.  See **Exhibit A**.

15.     Golden Grain Farms did not disclose to CHS at the time of the delivery and sale of the soybeans that they had been grown on dredge spoils from the Kalamazoo River Superfund Site.

16.     On October 28, 2016, the Michigan Department of Agriculture and Rural Development ("MDARD") was notified by MDEQ that crops had been harvested from the Site. Knowing that soybeans are used in both human food and animal feed products, MDARD's primary concern was to locate the soybeans and prevent them from entering into either food or feed.

17. Over the course of several days, MDARD attempted through multiple channels to find out from the property owner and from Mr. Brink of Golden Grain Farms where the harvested soybeans had been delivered and sold. While Golden Grain Farms failed to provide MDARD with assistance in locating the soybeans, MDARD's grain producer security program was able to track down the location, CHS's facility in Hamilton, Michigan. Once contacted by MDARD, CHS assisted MDARD in identifying the location of the subject soybeans, which had been placed in Bin #10.

18. On November 2, 2016, MDARD issued a seizure order (the "Seizure Order"), prohibiting CHS from moving or disposing of any of the soybeans in #10 until further written notice is given by MDARD. The Seizure Order indicated that MDARD had discovered that soybeans grown and harvested from a Superfund site were put into storage at CHS's Hamilton facility in Bin #10 and that CHS's sale or other use of the soybeans could result in further regulatory action, including fines and/or prosecution. See Seizure Order, **Exhibit B**.

19. In connection with the Seizure Order, MDARD placed a lock on Bin #10. At the time that the Seizure Order was issued and Bin #10 was locked by MDARD, the storage bin contained approximately 91,000 bushels of soybeans. Bin #10 has remained continuously locked since that time, and no soybeans have been removed from the bin as of the filing of this Complaint.

20. In the days following Golden Grain Farms' sale of the subject soybeans, Tom Brink, the owner of Golden Grain Farms, requested a meeting with Bob Fenton, the general manager of CHS's Hamilton, Michigan facility. During that meeting, Mr. Brink confessed that he had "made the biggest mistake of his life" in growing soybeans on contaminated dredge soils, and he asked for Mr. Fenton's help.

5

21. Notwithstanding Mr. Brink's admitted "mistake" (i.e., his knowing and surreptitious sale of soybeans that had been improperly planted and raised in contaminated material) and the immediate and significant harm to CHS, Mr. Fenton was more than willing to try to help Golden Grain Farms. CHS is a farmer-owned cooperative, and Mr. Fenton and CHS very much desired a "win-win" solution for both CHS and Golden Grain Farms. This is why CHS worked with MDARD in an effort to obtain the release of the Seizure Order and permission to sell the soybeans. These efforts included the exchange of information, meetings, phone calls, and other communication and correspondence between representatives of CHS and MDARD.

22. For its part, Golden Grain Farms also had its counsel take numerous steps in an attempt to have MDARD lift the Seizure Order and allow for the sale of the soybeans.

23. For example, on February 9, 2017, counsel for Golden Grain Farms wrote to Brad Deacon, the Director of the Office of Legal Affairs at MDARD. In its correspondence, counsel for Golden Grain Farms argued that there was no direct evidence indicating that any of the soybeans in Bin #10 were contaminated, and referred to a study performed by Lakeshore Environmental, Inc., who conducted sampling at the Site. According to counsel for Golden Grain Farms, the sampling results demonstrated that: (1) the majority of the hazardous constituents found upstream in the Kalamazoo River were not found on the Site, (2) the constituents that were detected at the Site (including PCBs, arsenic, and dioxins), were found in small enough concentrations that the Site was safe for a one-time agricultural use, and (3) farming operations occur elsewhere in the state on fields with significantly higher concentrations of the same or similar constituents. See February 9, 2017 correspondence, attached as **Exhibit C**.

6

24.     In its response, MDARD noted that Golden Grain Farms' February 9, 2017 letter omitted several important considerations and that MDARD otherwise disagreed with the material points in that letter.  See April 18, 2017 correspondence, attached as **Exhibit D**.

25.     First, MDARD noted that the dredged sediment and the property it was located on were subject to a restrictive covenant required by MDEQ that did not allow the Site to be used for agricultural purposes.

26.     MDARD further indicated that the most prudent approach after securing the contents of Bin #10 was to survey the subject field in which the soybeans were grown and take samples of any soybeans and plant material left, as well as soil samples from where the soybeans were grown.  Unfortunately, when MDARD staff arrived at the Site on November 2, 2016, they found large machinery engaged in a massive earthmoving operation.  According to MDARD, these actions by the landowner and/or Golden Grain Farms made it impossible to know what the conditions were in the field when the soybeans were grown on the dredged materials.  MDARD further noted that the earthmoving operation was done without notice to or approval from MDEQ under the terms of the restrictive covenant.

27.     MDARD further noted that it had been trying to find a resolution to the issue that was protective of human and animal health.  However, the proposals that had been submitted to MDARD relied primarily on the dilution of the compromised soybeans, a method that MDARD did not believe to be protective of human and animal health.  MDARD further indicated that it had discussed this matter to its counterparts at the U.S. Food & Drug Administration ("FDA"), who expressed similar concerns over the matter.

28.     MDARD's correspondence further provided evidence that MDARD indicated supported a finding that the soybeans were adulterated, and MDARD rejected Golden Grain

Farms' sampling data as insufficient to demonstrate whether or not contamination existed at the time the soybeans were grown.  MDARD further noted that Golden Grain Farms' sampling was done without MDARD's agreement or input, notwithstanding that discussions regarding potential sampling protocols was ongoing at the time.

29.     On March 28, 2017, in-house counsel for CHS wrote to counsel for Golden Grain Farms and proposed that Golden grain Farms purchase the entirety of the approximately 91,000 bushels of soybeans that were stored in Bin #10.  CHS indicated that it was willing to sell all of the soybeans on an "as-is" basis at an identified price.  See March 28, 2017 correspondence, attached **Exhibit E**.  Counsel for Golden Grain Farms rejected that offer the following day.  See March 29, 2017 correspondence, attached as **Exhibit F**.  In that same correspondence, counsel for Golden Grain Farms suggested that CHS propose the sampling protocol to MDARD that would allow the soybeans in Bin #10 to be released for processing.  *Id*.

30.     Counsel for Golden Grain Farms sent follow up correspondence to in-house counsel for CHS on April 17, 2017.  See **Exhibit G**.  In that correspondence, counsel for Golden Grain Farms indicated that Golden Grain Farms did not believe that any further sampling of the soybeans was warranted and that the information previously provided by Golden Grain Farms to MDARD should have been sufficient to allow for the release of the Seizure Order.  Nevertheless, counsel for Golden Grain Farms proposed that a limited sampling program be proposed to MDARD, and counsel propounded a list of questions in furtherance of such a sampling program. CHS responded to those questions in correspondence dated April 26, 2017.  See **Exhibit H**.

31.     On May 18, 2017, counsel for Golden Grain Farms sent correspondence to both MDARD and CHS advising both parties that Golden Grain Farms intended to submit approximately sixteen ounces of soybeans harvested from the Site for analytical testing.  See

**Exhibit I**.  On June 27, 2017, Golden Grain Farms provided the testing results to MDARD, with a copy to CHS.  See **Exhibit J**.

32.    CHS proposed its own sampling protocol to MDARD on August 7, 2017.  See **Exhibit K**.  As CHS indicated in its multi-page proposal, the purpose of its sampling and analysis plan was to allow MDARD to determine whether the soybeans would be acceptable for future processing in biodiesel and/or animal or human feed streams.  CHS's sampling and analysis plan included (1) a description of the methods for collecting representative samples of the soybeans for laboratory analyses for various inorganic and organic substances; (2) the identification of EPA analytical methods and detection limits for the laboratory analyses of the soybean samples; and (3) a description of the procedures for comparing laboratory results to acceptable concentration limits to evaluate the suitability of the soybeans for future processing in biodiesel and/or animal or human feed streams.

33.    On June 28, 2018, after not receiving a response from MDARD, CHS sent follow up correspondence in which it requested that MDARD either approve the previously-submitted sampling plan or allow the soybeans to be burned for energy recovery/alternate fuel at a bio-mass generator or disposed of at a landfill.  See **Exhibit L**.  CHS sent further follow up correspondence to MDARD on August 28, 2018.  See **Exhibit M**.

34.    On October 3, 2018, FDA wrote to MDARD, indicating that it had reviewed CHS's proposed sampling/reconditioning plan for the soybeans.  See **Exhibit N**.  Following its review, FDA informed MDARD that it did not support CHS's proposal.

35.    On October 11, 2018, MDARD responded to CHS's sampling and analysis proposal.  See **Exhibit O**.  Like FDA, MDARD indicated that CHS's proposal was not acceptable.  MDARD further indicated that it shared FDA's concerns about any possible food or

animal feed use of the soybeans.  Finally, MDARD indicated that it could not support the use of

the soybeans in any other manufacturing uses, including bio-diesel.  As such, MDARD indicated

that it could only support CHS's proposals to either incinerate or dispose of the soybeans at a

landfill.

36.     Golden Grain Farms continued to disagree with MDARD's findings and

determination with respect to the soybeans, and it took issue with the proposed sampling plan

that MDARD rejected.

37.     On December 5, 2018, counsel for CHS wrote to counsel for Golden Grain Farms

to make clear that CHS had no objection to Golden Grain Farms working directly with MDARD,

including with respect to any proposed sampling protocols.  See **Exhibit P**.  A representative

from MDARD was copied on that correspondence, and that representative confirmed with CHS

that MDARD would be willing to consider any additional sampling protocols submitted by

Golden Grain Farms.

38.     Upon information and belief, Golden Grain Farms did not submit any additional

proposed sampling protocols for the soybeans to MDARD.

39.     On June 20, 2019, CHS received follow up correspondence from MDARD

regarding the soybeans.  See **Exhibit Q**.  While MDARD indicated that it appreciated the efforts

that CHS had made to try to resolve the matter, MDARD reiterated its finding that "the soybeans

are not fit for human or animal use and [that] destruction is the only viable path."  MDARD

instructed CHS to make arrangements with MDARD personnel to coordinate the disposal of the

soybeans.  *Id*.

40. Thus, notwithstanding CHS's efforts to obtain the release of the Seizure Order and permission to sell the soybeans, MDARD and FDA have forbidden the sale or commercial use of the soybeans and have repeatedly indicated that destruction is the only viable path.

41. CHS has suffered a variety of damages as a result of Golden Grain Farms' knowing and surreptitious sale of soybeans that were grown on contaminated dredge spoils from the Kalamazoo River Superfund Site. First, CHS is entitled to a refund of the amounts paid for the soybeans, which are unmerchantable. In addition, CHS is entitled to its consequential damages under the Uniform Commercial Code, which include the value of the soybeans in Bin #10 that must now be destroyed and the profits that CHS has lost over the past two years form the loss of use of Bin #10. CHS has also suffered incidental damages in the form of additional costs and expenses incurred in storing the soybeans and in attempting to work with MDARD and FDA over the course of the past two years.

42. CHS has requested on multiple occasions that Golden Grain Farms compensate CHS for its damages, but Golden Grain Farms has refused to do so.

### COUNT I: BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

43. Plaintiff restates the allegations contained in paragraphs 1 through 42 as though fully restated herein.

44. Plaintiff and Defendant entered into one or more contracts for the sale of goods governed by the Uniform Commercial Code.

45. Pursuant to MCL § 440.2314, the goods are subject to an implied warranty of merchantability.

46. Defendant breached the implied warranty of merchantability.

47. Plaintiff has been damaged as a result.

WHEREFORE, Plaintiff, CHS, Inc., respectfully requests that this Court enter a judgment in its favor and against Defendant, Golden Grain Farms, LLC, in an amount in excess of $75,000, plus interest, costs, and attorneys' fees, and order all further relief appropriate in the circumstances.

## COUNT II: BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

48.     Plaintiff restates the allegations contained in paragraphs 1 through 47 as though fully restated herein.

49.     Plaintiff and Defendant entered into one or more contracts for the sale of goods governed by the Uniform Commercial Code.

50.     Pursuant to MCL § 440.2315, the goods are subject to an implied warranty of merchantability.

51.     Defendant knew the specific intended purpose for the goods that it sold to Plaintiff.

52.     Defendant had reason to know, and in fact had actual knowledge, that CHS was relying on Defendant's skill or judgment in recommending the goods at issue.

53.      Defendant breached the implied warranty of fitness for a particular purpose.

54.     Plaintiff has been damaged as a result.

WHEREFORE, Plaintiff, CHS, Inc., respectfully requests that this Court enter a judgment in its favor and against Defendant, Golden Grain Farms, LLC, in an amount in excess of $75,000, plus interest, costs, and attorneys' fees, and order all further relief appropriate in the circumstances.

Respectfully submitted,

VARNUM LLP
Attorneys for Plaintiffs


Date:   August 20, 2019               By: /s/ Brion B. Doyle                        
                                          Brion B. Doyle (P67870)
                                      Business Address and Telephone:
                                          Bridgewater Place, P.O. Box 352
                                          Grand Rapids, MI 49501-0352
                                          (616) 336-6000